Jason D. Guinasso (SBN# 8478)
5371 Kietzke Lane
Reno, NV 89511
775.853.8746
*guinassolaw@gmail.com*

Benjamin W. Bull*
Peter A. Gentala*
Dani Bianculli Pinter*
Christen M. Price*
Victoria Hirsch*
NATIONAL CENTER ON SEXUAL
EXPLOITATION
1201 F Street, NW, Suite 200
Washington, DC 20004
202.393.7245
*lawcenter@ncose.com*

* *Pro Hac Vice applications forthcoming*
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

JANE DOE;

Plaintiff,

v.

JOSEPH LOMBARDO, Governor of Nevada, in his official capacity; AARON FORD, Attorney General of Nevada, in his official capacity; NYE COUNTY; ELKO COUNTY; STOREY COUNTY; WESTERN BEST, INC. D/B/A CHICKEN RANCH; WESTERN BEST, LLC; DESERT ROSE CLUB, LLC; HACIENDA ROOMING HOUSE, INC. D/B/A BELLA'S HACIENDA RANCH; MUSTANG RANCH  PRODUCTIONS, LLC d/b/a MUSTANG RANCH LOUNGE, LLC; LEONARD "LANCE" GILMAN, in his official capacity; and LEONARD "LANCE" GILMAN, in his individual capacity,

Defendants.

Case No:

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**JURY TRIAL DEMANDED**

## COMPLAINT

## INTRODUCTION

1.      It is axiomatic that the right to be free from slavery is among the most basic of human rights: uncontested in international law and enshrined in the United States Constitution at significant cost.

2.      Yet it is a right numerous women and girls are denied in Nevada, where they are bought and sold in a glamorized, lucrative monument to male sexual entitlement: the state's prostitution industrial complex.

3.      Nevada has cooperated with Nye County, Elko County, Storey County, Western Best, Inc. d/b/a Chicken Ranch, Western Best, LLC, Desert Rose Club, LLC, Hacienda Rooming House, Inc. d/b/a Bella's Hacienda Ranch, Mustang Ranch Productions, LLC d/b/a Mustang Ranch Lounge, LLC, and Lance Gilman, to maintain and profit from a legalized system of prostitution – explicit in certain counties, and de facto elsewhere.

4.      Plaintiff Jane Doe was sex trafficked due to that system of legalized prostitution, that is, she was induced to engage in commercial sex acts through force, fraud, and coercion – including psychological manipulation, constraints on her movement, and debt – in legal brothels operating in Nevada.

5.      The collusion of the State of Nevada, its political subdivisions, and private businesses in the sex trade, which have in turn failed to enforce or violated state and federal laws against prostitution, prostitution advertising, debt bondage, and sex trafficking, has allowed Nevada's legal brothels to engage in sex trafficking with impunity.

6.      Under the Thirteenth Amendment, states cannot create conditions that allow slavery or involuntary servitude to flourish, including in the form of sex trafficking.  By providing legal cover for the sex trade, that is precisely what Nevada has done.

7.     Additionally, neither states nor private parties may perpetrate or benefit from slavery under the Trafficking Victims Protection Act, yet the Defendants have done so – through direct revenues, taxes, and licensing fees.

8.     Because Defendants have facilitated and profited from sex trafficking, violating the Thirteenth Amendment's ban on slavery and involuntary servitude and the Trafficking Victims Protection Act, Plaintiff now seeks to hold them accountable for these human rights violations.

## JURISDICTION AND VENUE

9.     This civil rights action raises federal questions under the Thirteenth Amendment to the United States Constitution, and the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1591–95.

10.    This Court has original jurisdiction over these federal claims under 28 U.S.C. §§ 1331 and 1343.

11.    This Court has authority to award the requested damages under 28 U.S.C. § 1343; the requested declaratory relief under 28 U.S.C. §§ 2201–02; the requested injunctive relief under 28 U.S.C. § 1343 and FED. R. CIV. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

12.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because Defendants reside in this district and division and/or the acts described in this Complaint occurred in this district.

## PARTIES

13.    Plaintiff Jane Doe is an individual residing in Nevada.

14.    Due to the sensitive, private, nature of Plaintiff Jane Doe's allegations, and the potential for harmful retaliation against her, she requests that this Court permit her to proceed

1  under a pseudonym. Courts recognize an exception to the general rule that pleadings name all
2  parties when the issues involved are of a sensitive and highly personal nature.

3      15.     For good cause, as exists here, the Court may permit a plaintiff to proceed in
4  pseudonym to protect a party from annoyance, embarrassment, oppression, or undue burden or
5  expense.  Here, granting pseudonym status is warranted because this litigation will involve the
6  disclosure of stigmatizing sexual information, including rape.  Plaintiff fears the stigma from
7  family, friends, current and future employers, and communities if her true identity is revealed
8  in the public record.

9      16.     Plaintiff simply seeks redaction of her personal identifying information from the
10 public docket and assurances that Defendants will not use or publish her identities in a manner
11 that will compromise her personal life or future employment prospects.

12     17.     Defendants will not be prejudiced by Plaintiff's use of a pseudonym.  Plaintiff
13 will agree to reveal her identity to the Defendants for the limited purpose of investigating
14 Plaintiff's claims once the parties are governed by a protective order.

15     18.     Plaintiff Jane Doe's motion for a protective order and leave to proceed
16 pseudonymously is forthcoming.

17     19.     Defendant Joseph Lombardo is the Governor of Nevada, ultimately responsible
18 for enforcing Nevada's laws and regulations, and is sued in his official capacity.

19     20.     Defendant Aaron Ford is the Attorney General of Nevada, who is authorized to
20 enforce and prosecute violations of Nevada's laws and regulations, and is sued in his official
21 capacity.

22     21.     Defendants Lombardo and Ford will be referred to here as "State Defendants."

23     22.     Defendant Nye County is a municipal corporation authorized under Nevada law
24 with the power to sue and be sued, to issue licenses and otherwise regulate brothels within the

county, and to enact and enforce certain ordinances challenged in this lawsuit.

23. Defendant Elko County is a municipal corporation authorized under Nevada law with the power to sue and be sued, to issue licenses and otherwise regulate brothels within the county, and to enact and enforce certain ordinances challenged in this lawsuit.

24. Defendant Storey County is a municipal corporation authorized under Nevada law with the power to sue and be sued, to issue licenses and otherwise regulate brothels within the county, and to enact and enforce certain ordinances challenged in this lawsuit.

25. Defendants Nye County, Elko County, and Storey County will be referred to here as "County Defendants."

26. Defendant Western Best, Inc. d/b/a Chicken Ranch is a company located at 6166 S. Sandhill Rd. #140, Las Vegas, NV, 89121. Western Best LLC is a company located at 6166 S. Sandhill Rd. #140, Las Vegas, NV, 89121. Western Best, Inc. and/or Western Best LLC own the Chicken Ranch, a legal brothel located at 10511 Homestead Rd, Pahrump, NV 89061.

27. Defendant Desert Rose Club, LLC is a company located at 1250 Lamoille Hwy, Ste. 734, Elko, NV, 89112. Desert Rose Club, LLC is a legal brothel located at 357 Douglas St, Elko, NV, 89801.

28. Defendant Hacienda Rooming House, Inc. d/b/a Bella's Hacienda Ranch is a company located at P.O. Box 281708, Lamoille, NV, 89828. Defendant Hacienda Rooming House, Inc. own Bella's Hacienda Ranch, a legal brothel located at 623 8th St. Wells, NV, 89835.

29. Defendant Mustang Ranch Productions, LLC d/b/a Mustang Ranch Lounge, LLC is a company operating a legal brothel and is located at 5 Wild Horse Canyon Dr, Sparks, NV 89434. Mustang Ranch Brothel is located at 1011 Wild Horse Canyon Dr, Sparks, NV

89434.

30.     Defendant Leonard "Lance" Gilman (hereinafter referred to as "Lance Gilman") is the owner of the Mustang Ranch Brothel and a Storey County Commissioner, residing at 5 Wild Horse Canyon Dr, Sparks, NV 89434.

31.     The corporations above are incorporated and/or licensed under Nevada law with the power to sue and be sued.[1]  Defendants Western Best, Inc. d/b/a Chicken Ranch and Western Best LLC, Desert Rose Club, LLC, Hacienda Rooming House, Inc. d/b/a Bella's Hacienda Ranch, Mustang Ranch Productions, LLC d/b/a Mustang Ranch Lounge, LLC, and Lance Gilman, will be referenced here as "Brothel Defendants."

## BACKGROUND

### The US sex trade in historical context

*Sex trafficking and chattel slavery*

32.     For over three hundred years, African people and their descendants were bought, sold, and used in chattel slavery in the Americas, that is, they were legally considered property, and were subjected to untold abuses, including torture, murder, family separation, coercion, and exploitation of their labor.

33.     Sex slavery was a part of chattel slavery in the American South.  White men subjected enslaved women and girls to rape and sexual abuse and harassment as a matter of course,[2] and women and girls were also sold specifically for prostitution in the euphemistically-named "fancy" trade.[3]

34.     Ellen Brooks was one such woman, bought by Bruckner Payne to be a

---

[1] A revoked or dissolved company can still be sued. *See* NEV. REV. STAT. §§ 86-274(5), 86-505 (2023).
[2] Neal Kumar Katyal, *Men Who Own Women: A Thirteenth Amendment Critique of Forced Prostitution*, 103 YALE L.J. 791, 796–803 (1993).
[3] Edward E. Baptist, *"Cuffy," "Fancy Maids," and "One-Eyed Men": Rape, Commodification, and the Domestic Slave Trade in the United States*, 106 AM. HIST. REV. 1619, 1619–22 (2001).

seamstress (a euphemism), then abused so badly that she died two weeks later.[4]  Enslaved women and girls were also forced to work in or manage brothels, and give their owners the fees they got from sex buyers.[5]

35.    In Louisiana, some sisters were raised as free daughters of a white planter and his mixed-race mistress.  Their father did not establish their legal status, as their mother warned him to do, before he died.  His creditors insisted that the sisters were legally slaves and refused their uncle's attempt to buy their freedom; they were sold into the New Orleans sex slavery market to pay for their father's debts.[6]

36.    In Alexandria, Virginia, Isaac Franklin and John Armfield had the largest, wealthiest slave trading firm in the United States in the 1820s and 1830s.[7]  Franklin was one of the main pimps for the New Orleans sex trafficking market.[8]  Both men joked in their letters to each other about the women they routinely raped.[9]

37.    This pervasive, commercialized sexual violence was not only admitted by the perpetrators, but decried by several abolitionists.  Harriet Jacobs, a formerly enslaved woman, wrote that as a 15-year-old, she was subjected to daily sexual abuse at the hands of her owner.[10]  Frederick Douglass called slave owners legalized brothel keepers, and averred that at least a million enslaved women were "consigned to a life of revolting prostitution" in the South.[11]

---

[4] Walter Johnson, *Soul by Soul: Life Inside the Antebellum Slave Market* 115 (1999).
[5] Judith Kelleher Schafer, *Brothels, Depravity, and Abandoned Women: Illegal Sex in Antebellum New Orleans* 11 (2009).
[6] 2 Harriet Martineau, *Society in America* 115-16, (Julia Miller ed., Project Gutenberg 2016) (1837).
[7] Hannah Natanson, *They were Once America's Cruelest, Richest Slave Traders. Why Does No One Know Their Names?*, WASHINGTON POST (Sept. 14, 2019, 7:00 AM), https://www.washingtonpost.com/history/2019/09/14/they-were-once-americas-cruelest-richest-slave-traders-why-does-no-one-know-their-names/.
[8] Baptist, *supra* note 3, at 1619.
[9] Natanson, *supra* note 7.
[10] Cheryl Nelson Butler, *The Racial Roots of Human Trafficking*, 62 UCLA L. REV. 1464, 1473–75 (2015).
[11] Katyal, *supra* note 2, at 799 (quoting *Frederick Douglass Discusses Slavery, 1850*, in *A Documentary History of the Negro People in the United States* 309, 313 (Herbert Aptheker ed., 2d ed. 1969)("I hold myself ready to prove that more than a million of women, in the Southern States of this Union, are, by the laws of the land, and

38.     One proslavery advocate confessed as much, writing:  "The fact is, that, in the Southern States, the prostitutes of the communities are usually slaves, unless they are imported from the free states.  The negro and the colored woman in the south, supply the place, which at the north is usually filled with factory and serving girls."[12]

*The Thirteenth Amendment*

39.     The Thirteenth Amendment was ratified in 1865, following the Civil War, to abolish slavery and involuntary servitude, except as a punishment for a crime.

40.     After the Amendment was ratified, Southern states attempted to evade its implications, including through allowing debt bondage, that is, compelled or voluntary labor to repay a debt.  Congress then passed the Peonage Act in 1867, banning debt bondage.[13]

41.     The United States Supreme Court also clarified the Amendment's application was not limited to the enslavement of black people in the American South, but to all persons, and to any form of slavery or involuntary servitude.[14]

42.     Southern states then started enacting criminal fraud statutes.  For example, a person who entered into a written contract for services in Alabama, received payment, and then failed to do the work or return the money could be charged with criminal fraud.[15]

---

through no fault of their own, consigned to a life of revolting prostitution . . . . I am also prepared to prove that slave breeding is relied upon by Virginia as one of her chief sources of wealth. It has long been known that the best blood of old Virginia may now be found in the slave markets of New Orleans. It is also known that slave women, who are nearly white, are sold in those markets, at prices which proclaim, trumpet-tongued, the accursed purposes to which they are to be devoted. Youth and elegance, beauty and innocence, are exposed for sale upon the auction block; while villainous monsters stand around, with pockets lined with gold, gazing with lustful eyes upon their prospective victims[.]").

[12] W. Gilmore Simms, *The Morals of Slavery,* 39-40; *reprinted in The Pro-slavery Argument* THE PRO-SLAVERY  ARGUMENT  175,  230  (Lippincott,  Grambo,  &  Co.  1853). https://archive.org/details/proslaveryargum00unkngoog/ mode/2up.

[13]  *See  42  U.S.  Code  §  1994-Peonage  Abolished,*  CORNELL  L.  SCH. https://www.law.cornell.edu/uscode/text/42/1994 (last visited Feb. 7, 2024).

[14] *See, e.g., Slaughter-house Cases*, 83 U.S. 36 (1873).

[15] *Bailey v. Alabama*, 219 U.S. 219, 227–28 (1911). There was an intent requirement:  you had to intend to injure or defraud the employer, but with a significant caveat: simply failing to provide the services – for whatever reason – was considered evidence of intent to commit fraud.

43.     The Supreme Court held that Alabama's law violated the Thirteenth Amendment, because threatening criminal penalties for failure to perform a contract was a way to indirectly coerce labor through debt bondage.[16]

44.     Alabama tried to argue that the law was merely a neutral fraud statute, but the Court reasoned that using apparently neutral statutes that had the effect – through the independent actions of third parties – of perpetuating slavery violated the Thirteenth Amendment.[17]

*Feminist activism and legal reforms*

45.     Many abolitionists were also active in movements to secure women's rights. Feminist activism in the late 1800s and early 1900s was concerned with preventing men's violence against women, including statutory rape, domestic violence, and prostitution.[18]

46.     In particular, activists focused on stopping what they called "white slavery" – that is, women and girls being forced, coerced, or defrauded into prostitution.

47.     Despite the characterization of sex trafficking as a danger primarily to white women, which was often fueled by racism, women of color remained very vulnerable to commercial sexual exploitation after the Thirteenth Amendment was enacted.

48.     During the Jim Crow era, red light districts were placed in black neighborhoods, and segregation did not stop white men from frequenting them.[19]

49.     A similar story played out in the North, with Southern black women being

---

[16] *Bailey v. Alabama*, 219 U.S. 238–42, 245 (1911).
[17] *Id.*
[18] *See, e.g.*, Bonnie Shucha, *White Slavery in the Northwoods: Early U.S. Anti-Sex Trafficking and Its Continuing Relevance to Trafficking Reform*, 23 WM. & MARY J. WOMEN & L. 75, 75–76 (2016); Jane E. Larson, *"Even a Worm Will Turn at Last": Rape Reform in Late Nineteenth-Century America*, 9 YALE. J. L. & HUMANS. 1, 2–4 (1997); Katyal, *supra* note 2, at 805–06.
[19] Vednita Nelson, *Prostitution: Where Racism & Sexism Intersect*, 1 MICH. J. GENDER & L. 81, 84 n.14 (1993). *See also* Anna Julia Cooper, *A Voice from the South* 12 (1892) (noting the need for a White Cross league – an anti-prostitution organization which focused its efforts on men – for black women and girls).

1    promised big city factory jobs and then forced into prostitution when they arrived.[20]

2        50.    Additionally, Chinese women were trafficked into the United States for purposes

3    of prostitution,[21] into situations recognized as slavery by the Ninth Circuit in at least one case.[22]

4        51.    For many key feminist activists in the nineteenth and early twentieth centuries,

5    campaigning against prostitution as a form of men's violence against women was central to

6    their advocacy.

7        52.    One of these was the prominent physician and theologian Katharine Bushnell, a

8    spokesperson for the Women's Christian Temperance Union, who spent several years opposing

9    the prostitution of Chinese women and girls in the San Francisco area, who were exploited by

10   Chinese traffickers and white male buyers.[23]

11       53.    Some women and girls were auctioned off for prostitution at San Francisco's

12   wharf, well after slavery had been outlawed in the United States.[24]

13       54.    Women formed a mission house as a refuge for prostituted women and girls,

14   facing down pressure from white city officials and Chinese organized crime.

15       55.    Bushnell similarly investigated and exposed the sex trafficking of women and

16   girls into Wisconsin in the 1880s, where many brothels were attached to logging camps.[25]

17       56.    Bushnell also worked with Josephine Butler, an abolitionist and women's rights

18   activist, to combat the exploitation of women and girls through prostitution in other countries

19   _____

[20] Butler, *supra* note 10, at 1490.

20  [21] *See, e.g.*, *Id.* at 1480.

[22] The court found that this fact did not enable them to prevent enforcement of immigration laws. *United States*

21  *v. Ah Sou*, 138 F. 775, 777–78 (9th Cir. 1905) (ruling that they must enforce an immigration statute even though it would result in deporting a Chinese woman back into a likely life of what the court termed slavery, because she had been forced into prostitution)

22  [23] Dana Hardwick, *San Francisco and 'Social Hygiene,'* in *Oh Thou Woman that Bringest Good Tidings*, 73–75 (2002).

23  [24] Anna Diamond, *The Women Who Waged War Against Sex Trafficking in San Francisco,* SMITHSONIAN MAGAZINE (May 8, 2019), https://www.smithsonianmag.com/history/women-banded-together-fight-slavery-san-francisco-180972113/.

24  [25] *See, e.g.*, Shucha, *supra* note 18, at 75.

as well, including China, India, and the United Kingdom.

57.    For example, in nineteenth century Britain, Josephine Butler's campaign to eradicate the Contagious Diseases Act centered on the fact that the process was invasive, degrading, and stigmatizing. The testing of alleged prostituted women, and not male buyers, highlighted the disparity between the prostituted and those exploiting them. It not only neglected the harm of prostitution itself but compounded its harm by only protecting the male buyer. It was successfully repealed in 1886.[26]

58.    In 1910, Congress passed the Mann Act, which criminalized the interstate or foreign transport of women and girls for prostitution purposes.[27] Congressional reports from that time show that Congress considered what they termed "forced prostitution" to be a form of slavery.[28]

59.    Between 1904 and 1949, a number of international treaties also sought to address the sex trafficking of women and girls, assuming a direct connection between prostitution and exploitation.[29]

---

[26] Josephine Butler, *Josephine Butler and the Prostitution Campaigns: Diseases of the Bodily Politic* (Jane Jordan & Ingrid Sharp eds., 2004), https://www.routledgehistoricalresources.com/feminism/sets/josephine-butler-and-the-prostitution-campaigns.

[27] *Mann Act*, CORNELL L. SCH., https://www.law.cornell.edu/wex/mann_act (last visited Feb. 7, 2024).

[28] *See also* Katyal, *supra* note 2, at 806 (citing H.R. Rep. No. 47-61, at 10 (1909); S. Rep. No. 886-61, at 11 (1909)).

[29] *See* Convention for the Suppression of the Traffic in Persons and of the Exploitation of the Prostitution of Others, July 25, 1951, 96 U.N.T.S. 271, https://www.ohchr.org/en/professionalinterest/pages/trafficinpersons.aspx.
      (1) International Agreement of 18 May 1904 for the Suppression of the White Slave Traffic, as amended by the Protocol approved by the General Assembly of the United Nations on 3 December 1948,
      (2) International Convention of 4 May 1910 for the Suppression of the White Slave Traffic, as amended by the above-mentioned Protocol,
      (3) International Convention of 30 September 1921 for the Suppression of the Traffic in Women and Children, as amended by the Protocol approved by the General Assembly of the United Nations on 20 October 1947,
      (4) International Convention of 11 October 1933 for the Suppression of the Traffic in Women of Full Age, as amended by the aforesaid Protocol . . . .
*Id.* pmbl.

*The Nevada sex trade in contemporary context*

*Federal and international laws on sex trafficking*

60.    In 2000, Congress passed the Trafficking Victims Protection Act, the first comprehensive law in the United States to explicitly penalize the full range of human trafficking offenses, including sex trafficking.

61.    Congress reauthorized the law in 2003 as the Trafficking Victims Protection Reauthorization Act (TVPRA) and created a civil cause of action. 18 U.S.C. § 1595.

62.    Under the TVPRA, sex trafficking occurs if there is a commercial sex act involving a person under age 18 or a person induced by force, fraud, or coercion.[30] This is considered a severe form of trafficking in persons under federal law. 22 U.S.C. § 7102 (11)(A). Anyone who "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means" or "benefits, financially" from sex trafficking can be held liable.

63.    Commercial sex act means "any sex act, on account of which anything of value is given to or received by any person."[31]

64.    Coercion includes "threats of serious harm to or physical restraint against any person; any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or the abuse or threatened abuse of law or the legal process."[32]

65.    Serious harm refers to "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the

---

[30] 18 U.S.C. § 1591.
[31] *Id.* at § 1591(e)(3).
[32] *Id.* at § 1591(e)(2).

surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm."[33]

66.     Section 1595 authorizes civil claims against sex trafficking perpetrators, as well as anyone who "knowingly benefits, financially or by receiving anything of value" from participating in what the person knew or should have known was a sex trafficking venture.[34]

67.     Prostitution continues to be against federal policy as a form of sexual exploitation that is linked to sex trafficking.[35]

68.     This is consistent with international law. The 1949 UN Convention for the Suppression of the Traffic in Persons and of the Exploitation of the Prostitution of Others states that, "prostitution and the accompanying evil of the traffic in persons for the purpose of prostitution are incompatible with the dignity and worth of the human person," and forbids prostitution related activities, including exploiting "the prostitution of another person, even with the consent of that person."[36]

*Connections between prostitution and sex trafficking*

69.     It is also borne out by experience. Prostitution is associated with a high risk of sexual assault and other violence, predominately from sex buyers.[37]

---

[33] *Id.* at § 1591(e)(5).
[34] 18 U.S.C. § 1595.
[35] *See, e.g.*, 22 U.S.C. § 7601 ("Prostitution and other sexual victimization are degrading to women and children and it should be the policy of the United States to eradicate such practices.").
[36] Convention for the Suppression of the Traffic in Persons and of the Exploitation of the Prostitution of Others, pmbl., Art. 1, July 25, 1951, 96 U.N.T.S. 271, https://www.ohchr.org/en/professionalinterest/pages/trafficinpersons.aspx.
[37] For example, a study of 562 women exploited in prostitution in Miami, Florida (USA) found the lifetime prevalence of abuse was extremely elevated at 88%, and 34% reported violent encounters with "dates" or clients in the prior 90 days. Serious mental illness among this population of prostituted women was quite common, with 74% reporting severe symptoms of depression, anxiety, or traumatic stress. Hilary L. Surratt et al., *HIV Risk Among Female Sex Workers in Miami: The Impact of Violent Victimization and Untreated Mental Illness*, 24 AIDS CARE, 553-561 (2012). Also, a study of homicide in the United States from 1970 to 2009 found that prostituted persons accounted for 32% of all cases of serial murder involving female victims only. The proportion of serial

70.     When prostitution is legal, it leads to increased sex trafficking to meet demand. This has occurred in Rhode Island and in the Netherlands.

71.     In Rhode Island, indoor prostitution was decriminalized from 1980-2009 and during that time the illicit trade exploded, and it heavily involved organized crime.[38]

72.     Brothels existed under the guise of spas and health services but were deeply intertwined with the international trafficking of Asian women.[39]

73.     Men visited these spas from nearby states in droves and their reviews of these places increased by 200% reflecting the explosion of the sex trade, especially in Providence.[40]

74.     The lack of regulations also meant that 16 and 17-year-olds were involved in these enterprises, police were unable to adequately investigate matters, and labor laws or code violations were insufficient ways to get at the more serious crimes.[41]

75.     Legalization in the Netherlands has also been ineffective at curbing illegal activities. In fact, the illegal industry flourishes, and the criminals who run those operations also participate in the legal industry, which provides further cover for their illicit activities.[42] Multiple studies out of the Netherlands indicate organized crime permeates it, and conclude that it is impossible to eliminate, or even reduce, the criminal aspects of the sex trade.[43] These

---

murders with female prostituted victims increased across the study period, from 16% during 1970-1979 to 69% during 2000-2009. Killers of prostituted women also amassed a greater average number of victims than do killers of other victim types and kill for slightly longer periods of time. Kenna Quinet, *Prostitutes as Victims of Serial Homicide: Trends and Case Characteristics, 1970-2009*, 15 HOMICIDE STUDIES 74-100 (2011).

[38] Melanie Shapiro & Donna M Hughes, *Decriminalized Prostitution: Impunity for Violence and Regulation*, 52 WAKE FOREST L. REV. 534 (2017).

[39] *Id.* at 545. In fact, the largest mafia bust in FBI history resulted from infiltration of these brothels and led to the arrest of over 127 people from seven crime families including the Gambinos, with extortion efforts totaling up to 1.5 million dollars. *Id.* at 547.

[40] *Id.* at 540.

[41] *Id.* at 552-555.

[42] Sheila Jeffreys, *Brothels Without Walls: The Escort Sector as a Problem for the Legalization of Prostitution*, 17 SOC. POL.: INT'L STUD. GENDER, ST., SOC'Y 210 (2010).

[43] Karin Werkman, *Briefing on Legal Prostitution in The Netherlands: Policies, Evaluations, Normalisation*, June 2016, feminismandhumanrights.files.wordpress.com/2014/06/karin-werkman-2016-briefing-on-legal-prostitution-in-the-netherlands.pdf (last visited Sep. 9, 2021).

1   conclusions have led legislators to consider new approaches and revamp their existing
2   policies.[44]

3        76.    The legal trade also correlates with an increase in sex trafficking: two multi-
4   country studies have concluded that wherever there is legal or decriminalized prostitution,
5   human trafficking increases. One study compared 39 nations and the other was more
6   expansive, assessing 150 countries, and both found a relationship between prostitution laws
7   and sex trafficking.[45]  Sex trafficking is greater in countries where prostitution is legal or
8   decriminalized.[46]

9        77.    Legalized prostitution also correlates with lax sex trafficking enforcement
10  efforts.

11       78.    Switzerland, which has legalized prostitution, received a Tier 2 rating[47] for the
12  third year in a row in the U.S. Trafficking in Persons Report.  The government sentenced the
13  traffickers it convicted very lightly, "resulting the majority of traffickers receiving fully
14  suspended sentences or sentences of less than one year imprisonment."[48]

15       79.    New Zealand, which has decriminalized prostitution (though in practice it
16  appears to operate like other legalization regimes[49]), received a Tier 2 rating for the third year
17  in a row in the U.S. Trafficking in Persons Report.  The government did not prosecute or

18

---

19  [44] Jeffreys, *supra* note 42, at 11.

[45] Niklas Jakobsson & Andreas Kotsadam, *The Law and Economics of International Sex Slavery: Prostitution*
20  *Laws and Trafficking for Sexual Exploitation*, 35 EUR. J. L. AND ECON. 1 (2013); Seo-Young Cho, Axel Dreher,
    & Eric Neumayer, *Does Legalized Prostitution Increase Human Trafficking?*, WORLD DEV. 41 (2013).
    [46] *Id.*
21  [47] This means the country is failing to meet "minimum standards for the elimination of trafficking but is making
    significant efforts to do so." United States State Department, Trafficking in Persons Report 2023,
22  https://www.state.gov/reports/2023-trafficking-in-persons-report/switzerland  (last visited Feb. 7, 2024).
    [48]  United States State Department, Trafficking in Persons Report 2023, https://www.state.gov/reports/2023-
23  trafficking-in-persons-report/switzerland  (last visited Feb. 5, 2024).
    [49]*Coalition against Trafficking Women,* Germany New Zealand: a Comparison in Prostitution Laws, 2002-2017,
    *available at*  https://catwinternational.org/wp-content/uploads/2021/06/Germany-New-Zealand-A-Comparison-
24  in-Prostitution-Law-FINAL.pdf?eType=EmailBlastContent&eId=44444444-4444-4444-4444-444444444444.

---

1  convict a single trafficker in 2021 or 2022, and has "never identified a certified adult victim of

2  sex trafficking."[50]

3     80.    In Nevada, the signs point to similar conclusions. It is estimated that illegal

4  prostitution generates 5 billion dollars in in Las Vegas alone,[51] even though prostitution is not

5  legal in Las Vegas.  Legal brothels are reported to provide 75 million dollars of revenue for

6  the state.[52]  More to the point, they allow the sex trade to flourish all over the state and become

7  a part of tourist expectations, which increases state revenue.  In other words, the legal trade

8  correlates with exponential increases in the illegal trade and state cash flow.

9  *Nevada's legal norms and sex trafficking*

10     81.    In the United States, Nevada stands alone in maintaining legalized prostitution,

11  in apparent defiance of the legal and human rights norms and data described above.

12     82.    While Nevada has allowed brothel operation since the nineteenth century, the

13  first officially sanctioned brothel, Mustang Ranch, was licensed by Storey County in 1971.

14     83.    Nevada then enacted NEV. REV. STAT. § 244.345(8), legalizing prostitution in

15  county-licensed brothels, for counties with fewer than 200,000 residents.

16     84.    Prostitution is now permitted in counties that have fewer than 700,000

17  residents, and Nevada currently has legal brothels in seven counties: Elko,[53] Lander,[54] Lyon,[55]

18  Mineral,[56] Nye,[57] Storey,[58] and White Pine.[59]

19

---

20  [50] United States State Department, Trafficking in Persons Report 2023, https://www.state.gov/reports/2023-trafficking-in-persons-report/new-zealand/ (last visited Feb. 5, 2024).
[51] Ronald B. Flowers, *Prostitution in the Digital Age: Selling Sex from the Suite to the Street* 42-46 (2011).
21  [52] *Id.*
[53] ELKO, NEV., COUNTY CODE, § 6-11 (2020) (defining sexually oriented businesses and employee licensing).
[54] LANDER, NEV., COUNTY CODE, "Prostitution," § 5.16 (2020) (defining prostitution).
22  [55] LYON, NEV., COUNTY CODE, § 5.03 (2020 (defining brothels).
[56] MINERAL, NEV., COUNTY CODE, § 5.12 (2019) (defining prostitution).
23  [57] NYE, NEV., COUNTY CODE, § 9.20 (2020) (defining prostitution).
[58] STOREY, NEV., COUNTY CODE, § 5.16 (2015) (defining brothels).
24  [59] WHITE PINE, NEV., COUNTY CODE, § 10.36 (2021) (disallowing prostitution in unincorporated areas of White Pine, but allowing such activity within the incorporated areas). *See* ELY, NEV., CITY ORDINANCE, "Prostitution,"

85.     State regulations force women in prostitution to get tested for sexually transmitted infections every week. NEV. ADMIN. CODE § 441A.800.

86.     Nevada does not require sex buyers to undergo any similar testing. Not unlike the Contagious Diseases Act in nineteenth-century Great Britain described above, the one-sided testing protects the sex buyer and compounds the harm to and burden on the prostituted persons.

87.     State regulations provide that a person who fails to comply with the regulations mandating STI testing can be forced by court injunction to submit to STI testing. NEV. REV. STAT. §441A.900 (providing for injunction as to "[a] person who refuses to . . . [c]omply with any regulation of the Board relating to the control of a communicable disease" or "[s]ubmit to approved treatment or examination required or authorized by this chapter.").

88.     State regulations also obligate prostituted people to "require each patron" to use a condom. NEV. ADMIN. CODE § 441A.805.

89.     If prostituted people fail to control the men buying them in this way, they are violating the regulation. NEV. ADMIN. CODE § 441A.805.

90.     There is no penalty for a sex buyer who refuses to use a condom.

91.     The State thus signals that its enforcement priority is protecting the health and comfort of the sex buyer, even if creates coercive conditions for the prostituted people.

92.     Nevada has also legalized prostitution by euphemism: Nevada permits cities and counties to license escorting, and what it terms "entertainment by referral service," defined as follows:

> (a) "Entertainer for an entertainment by referral service" means a natural person who is sent or referred for a fee to a hotel or motel room, home or other accommodation by an entertainment by referral service for the purpose of entertaining the person located

_____

§ 3.6 (2020) (city within White Pine County explicitly authorizing prostitution).

1    in the hotel or motel room, home or other accommodation.

2    (b) "Entertainment by referral service" means a person or group of persons who send
     or refer another person to a hotel or motel room, home or other accommodation for a
3    fee in response to a telephone or other request for the purpose of entertaining the person
     located in the hotel or motel room, home or other accommodation.
4    NEV. REV. STAT. § 244.345(8).

5        93.    Independent prostitution in Nevada is absolutely prohibited: it is illegal for a

6    person to engage in prostitution outside of a legal brothel, NEV. REV. STAT. § 201.353, and the

7    "entertainment by referral service" is defined such that the "entertainer" must be "sent or

8    referred" by someone else. NEV. REV. STAT. § 244.345(8).

9        94.    Thus, legal prostitution in Nevada requires that the prostituted person be under

10   the control and direction of someone else, that is, Nevada's legal regime requires prostituted

11   people to have pimps. [60]

12       95.    This pimp-control requirement sets prostituted people up for exploitation by

13   design, and combined with the State Defendants' apparent commitment to protecting sex

14   buyers – as seen through their regulation and enforcement priorities – sends a clear message to

15   commercial sexual exploiters about what they can expect to get away with.

16       96.    In Nevada, local governments are political subdivisions of the state with

17   severely limited autonomy, permitted to do only what the State explicitly allows. See, e.g.,

18   NEV. REV. STAT.§ 281A.145; Ronnow v. City of Las Vegas, 65 P.2d 133, 136 (1937).

19       97.    Yet Nevada generally permits counties to self-regulate as to prostitution, even

20   where there are obvious conflicts of interest.

21       98.    In Storey County, the local brothel owner is also a county commissioner who

---

[60] See https://dictionary.cambridge.org/dictionary/english/pimp (a pimp is someone who "controls prostitutes, especially by finding customers for them, and takes some of the money that they earn").

sits on the brothel board, the government entity that supposedly regulates the brothels.[61]

99.     In the legal brothels, women are commonly subjected to a number of practices that amount to debt bondage, including:

- Being locked inside the brothels and not allowed to leave for weeks at a time;

- Having to give the brothel 50% of their earnings;

- Being required to follow the brothel's rules or face fines; and

- Being forced to live on the premises and pay the brothels for room and board to do so.

100.    Some brothels are also surrounded by high fences, which are mandatory in at least one county.[62]

101.    Most Nevada brothels are located in the middle of the desert –in extremely remote locations, with few trees or spaces where a person would not be immediately visible during the daytime, and often without meaningful access to public transportation.  In rural areas, there are few street lights, and the nearest shelter or even town could be miles away, making it completely unsafe to travel on foot by night.  Uber is also often expensive, and might either be unavailable altogether or take a long time to arrive.

102.    Given that the legal brothels often do not permit women to bring their own cars, these factors severely isolate women, and make it difficult to impossible for them to leave, even were they not locked inside the brothels.

103.    The practices described above are inherently coercive, particularly given the geographic context, and lead to women in prostitution owing the brothels money and being

---

[61] *See* STOREY, NEV., COUNTY CODE, § 5.16 (2015).
[62] Lyon Co. Code, § 5.03.13 (A)(3) (2022) (requiring "all licensed operations shall be enclosed by a fence not less than six feet (6') in height; such fence shall be equipped with an entrance gate that will prevent access to the premises unless the gate is opened from the inside").

1 held in debt bondage in legal Nevada brothels.

2     104.   Many women prostituted in Nevada brothels are controlled by outside pimps,

3 in addition to brothels themselves, which also act as pimps.

4     105.   One federal court acknowledged this problem recently, citing a study that found

5 that pimps remained common and some assaults against prostituted women occurred within

6 Nevada's legal brothels. *Coyote Publishing, Inc. v. Miller*, 598 F. 3d 592, 596 n.2 (2010).

7     106.   In 2018, the Lyon County Sheriff's Office conducted multiple brothel work

8 card compliance checks, assisted by U.S. Immigration and Customs Enforcement officials.

9 They found numerous illegal practices, including immigration law violations, fraudulent

10 statements, and sex trafficking indicators.[63]

11 *Nye County*

12     107.   Prostitution is legal in Nye County, which is just outside Las Vegas.

13     108.   In Nye County, a legal brothel may be located within a trailer or a tent.  Nye

14 Co. Code § 9.20.020.

15     109.   The Nye County Code states that solicitation is illegal unless it occurs within a

16 legal brothel.  Nye Co. Code § 9.20.160.

17     110.   The Nye County Code defines solicitation as someone who offers to engage in

18 prostitution, or who "[i]nduces, persuades, encourages, inveigles or compels" someone else to

19 do so.  Nye Co. Code § 9.20.020.

20     111.   The Nye County Code does not define "compel."

21     112.   By implication, Nye County does not ban compelling prostitution as long as the

22 perpetrator does so in a legal brothel.

23

24 [63] Lyon County Sheriff's Office, *Internal Audit Report on Brothel Compliance Requirements* (2018).

113.    Compelling someone to engage in prostitution violates federal law, which bans sex trafficking, including coercing people into commercial sex acts.

114.    The Nye County brothel licensing board *may* refuse to grant a brothel license to someone who has been convicted of a felony, has a financial interest in an illegal prostitution business, is under twenty-one years old, or has had a previous brothel license revoked for cause, but *is not required* to do so.  Nye Co. Code § 9.20.120.

115.    While Nye County *may* refuse to grant a brothel license to someone who has a felony conviction or who has business interests in illegal prostitution, a work card for a prostituted person *shall not* be issued to a person who has made false statements on the application, is under twenty-one, or has been convicted of a felony involving a crime of sexual nature, a sexual crime involving children, or a heinous crime.  Nye Co. Code § 9.20.120 (D).

116.    Each prostituted person is required to have weekly medical examinations for STIs.  Nye Co. Code 9.20.150.

117.    Sex buyers frequenting Nye's brothels are not subject to any medical examinations or tests for STIs.

118.    The Nye County Code does not contain any protections for sex trafficking, including screening for it in the licensing process.

*Elko County*

119.    Elko County also legalizes prostitution.

120.    Prostitution is illegal in Elko County unless it occurs within a legal brothel.  Elko Co. Code § 4-9-3.

121.    The County *may* deny a brothel license to someone who was convicted of a felony, has business interests in illegal prostitution, or who has "willfully omitted or incorrectly stated any material fact" in their application.  Notably, the County *is not required* to do so.

1 Elko Co. Code § 4-9-7(G).

2      122.   A prostituted person must have a work card and may only have a work card for

3 one brothel at a time. Elko Co. Code § 4-9-13.

4      123.   Each prostituted person is required to have weekly medical examinations for

5 STIs. Elko Co. Code § 4-9-14.

6      124.   If a prostituted person leaves the brothel for more than 24 hours, she must

7 submit to an additional medical examination before returning.   Elko Co. Code § 9-14-

8 8(A)(8)(b).

9      125.   If a prostituted person tests positive for an STI, she will be effectively detained

10 – *by operation of county law* – at the brothel until the State Board of Health contacts her; after

11 they notify her the law no longer requires her to stay onsite. Elko Co. Code § 4-9-14(8)(b) ("If

12 any sex worker's test results are positive for an infectious, contagious or communicable

13 disease, the sex worker must be pulled off the brothel floor immediately and the sex worker's

14 work card turned over to the Police Department. The sex worker must wait at the house of

15 prostitution until the State Board of Health notifies the sex worker. Once contact by the State

16 Board of Health with the sex worker has taken place, nothing in this chapter shall prohibit the

17 sex worker from leaving the premises of the house of prostitution.").

18      126.   The State of Nevada has allowed this regulation to stand, even though it is listed

19 a participant in this extrajudicial detention within a private sex trade business.

20      127.   Sex buyers frequenting Elko's brothels are not subject to any medical

21 examinations or tests for sexually transmitted diseases.

22      128.   Elko County is an extremely rural area, over 280 miles from Reno, and over

23 400 miles from Las Vegas.

24      129.   Elko County requires a translator to be provided for prostituted people who do

not speak English for their communications with the county, but not with or within the brothel. Elko Co. Code § 4-9-15(D).

130. The police may deny a work card for several reasons. Most notably, the police may deny a work card to a person who is under the age of twenty-one but are not required to do so, even though it is illegal for anyone under twenty-one to work in a brothel. Elko Co. Code § 4-9-13 (D)-(E).

131. The Elko County Code does not contain any protections for sex trafficking, including screening for it in the licensing process.

132. While the Elko County Code maintains that the Board may revoke a brothel's license for any other cause which the Board may determine to be harmful to the "health, welfare, and safety of the general public," there is no provision that is concerned with the wellbeing of the prostituted persons inside the brothel.

*Storey County*

133. Prostitution is legal in Storey County, which is outside of Reno, Nevada.

134. Prostitution is illegal in Storey County unless it occurs in a licensed brothel. Storey Co. Code § 5.16.010.

135. The brothel licensing board, which consists of the county commissioners and the sheriff, has the authority to grant or deny licenses following a Sheriff's investigation. Storey Co. Code § 5.16.090.

136. The County may deny a brothel license to someone convicted of a felony, has business interests in illegal prostitution, or who makes a false statement about a material fact in the application. Notably, the County *is not required* to do so. Storey Co. Code § 5.16.110.

137. Brothels are required to have "designated perimeter barriers" such as a fence. Storey Co. Code § 5.16.170.

138.    Brothel licenses are renewed automatically annually as long as they remain in "substantial compliance" with the County Code but there is no mention of how this is confirmed or what qualifies as substantial compliance.  Storey Co. Code § 5.16.100.

139.    Escort services are permitted and require an addition license.  Prostitution or solicitation of sexual activity is prohibited outside the perimeter of the brothel.  Storey Co. Code § 5.16.070

140.    A prostituted person must have a work card for the brothel and may only have a work card for one brothel at a time.  Storey Co. Code § 5.16.220.

141.    Each prostituted person is required to have weekly STI examinations.  Storey Co. Code § 5.16.210.

142.    The sheriff *may* deny the work card for several reasons, including the applicant being under the age of eighteen, but *is not required* to do so.  Storey Co. Code § 5.16.220.

143.    Having a person under the age of eighteen participate in prostitution violates federal law, which bans sex trafficking.

144.    The Storey County Code does not contain any protections for sex trafficking, including screening for it in the licensing process.

145.    While the Storey County Code maintains that the Board may revoke a brothel's license for "[a]ny other cause which the board may determine, in its sound discretion, to be deleterious to the health, welfare, and safety of the general public," there is no provision that is concerned with the wellbeing of the prostituted persons inside the brothel.  Storey Co. Code § 5.03.180.

146.    Lance Gilman is on the Storey County Board of Commissioners which means he is also on the Brothel Licensing Board of Storey County.

147.    Lance Gilman is the owner of Mustang Ranch.

148.    Being a member of the Board, Lance Gilman is in the position to approve brothels as well as to revoke licenses and determine violations made by the brothels, including his own brothel.

149.    Additionally, according to Mr. Gilman, he was a principal in and the Director of Marketing for the Tahoe Reno Industrial Center ("TRI").

150.    The Mustang Ranch is located in a short canyon outside of TRI. His company, Lance Gilman Commercial Real Estate Services, was and has been since the inception of TRI, the exclusive broker for this industrial park.

151.    TRI is a massive 80,000 acre park that encompasses a 30,000 acre industrial complex approximately nine miles east of Reno, Nevada in Storey County, and is the largest industrial park of its kind in the United States.

152.    According to Mr. Gilman, he has been instrumental in attracting to TRI, nationally recognized firms as Tesla/Panasonic, SWITCH, Google, Blockchain, eBay, Wal-Mart, Tire Rack, Jet.com, Petsmart, and US Ordnance, to name a few.

153.    According to Mr. Gilman, in the early 2000s, the leaders of Storey County needed to take fast action to bolster critically lacking tax revenues for the County, which was cash poor at the time.

154.    According to Mr. Gilman, these leaders approached Mr. Gilman and requested he open a brothel, which could immediately generate greatly needed tax revenues for the County until TRI could begin bringing in more companies and subsequently growing the tax base.

155.    Then, according to Mr. Gilman, in or around 2003, "to further bolster lagging tax revenues for Storey County", Mr. Gilman purchased the Mustang Ranch brothel buildings and trademark on Ebay from the Federal government.

156.    According to Mr. Gilman, because of its historic value, Mr. Gilman spent millions in moving the buildings to a location adjacent to the Mustang Ranch and in upgrading its facility. In addition to serving as the County Commissioner, Mr. Gilman has pushed a false narrative within Storey County, that without Lance Gilman and his "businesses", Storey County lacks tax revenues.

157.    Mr. Gilman does not appear to care about the safety, security, and well-being of the women he commercially exploits.

158.    Mr. Gilman exploits women to make money.  Indeed, the women are objects to be bought, sold, and disposed of for men's entertainment.

159.    In this regard, Mr. Gilman and his brothel created a video just a few years ago titled, "Hunt a Ho."

160.    In the "Hunt a Ho" video he brags about hosting an event where a world record was set for "jumping the most titties."

161.    Further, he refers to the women as "prey" to be hunted by men with  60-caliber paint ball rifles.

162.    This was Lance Gilman's "hot" idea to generate business to make money.

163.    He has not and does not have concern for the safety and dignity of the women being objectified and exploited by him.

*Sex trafficking and law enforcement*

164.    Legalized prostitution increases the demand for commercial sex, and men travel to Nevada to buy sex because they incorrectly believe it is legal throughout the state.

165.    The sex industry exploits this misconception with impunity, that is, by operating both legal and illegal entities that violate federal laws against debt bondage and sex trafficking, without facing any meaningful enforcement from Nevada.

166.   Prostitution advertising, for both legal and illegal prostitution in Nevada, is pervasive online, and directed toward people outside the counties where prostitution is legal.

167.   On information and belief, many men who buy women for sex in Nevada come from outside Nevada, many of them induced by online advertising and marketing.

168.   On information and belief, Nevada does not enforce the advertising regulations, NEV. REV. STAT. §§ 201.430; 201.440, that outlaw prostitution advertisements outside the counties that permit brothels.

169.   Nevada itself has acknowledged this problem, submitting a federal grant application for combating sex trafficking, admitting that the state is "a major national and even global destination, because Nevada is also synonymous with legalized gambling, legalized prostitution, clubbing, partying, bars, strip clubs, celebrities, glamour and gaudy excess – a grand spectacle of legitimized sin 24/7, 365 days per year!"  The application also noted that prostitution is not "universally legal in Nevada," despite visitors' belief otherwise, and:

> Nevada's legal brothels complicate development of a consistent statewide response to sex trafficking . . . Nevada's recognition as one of the top trafficking destinations by multiple government and non-profit advocacy agencies is earned by effectively marketing the state's entertainment and fantasy fulfillment possibilities.[64]

170.   Nevada did not criminalize sex trafficking until 2013.

171.   Nevada had 4 new federal sex trafficking prosecutions in 2020, for a total of 9 active cases (compared to 7 in the District of Columbia, 30 in Illinois, 44 in New York, and 61 in Texas), and 0 sex trafficking convictions (compared to more than 150 nationwide).[65]

172.   Nevada had 1 new federal sex trafficking prosecution in 2021 (out of 183

---

[64] OVC FY 2014 Services for Victims of Human Trafficking Grant Application Nevada Office of the Attorney General – Program Narrative.
[65] *See* Kyleigh Feehs & Alyssa Currier Wheeler, *2020 Federal Human Trafficking Report*, https://traffickinginstitute.org/2020-federal-human-trafficking-report/..

nationwide), for a total of 11 active cases, and 3 sex trafficking convictions.

173.    While these numbers may seem reflective of Nevada's relatively small population (3.2 million residents),[66] they are disproportionately low given Nevada's extremely high tourism numbers:  in 2018, Las Vegas had 42.1 million visitors (compared to 21.8 million in Boston, 22.8 million in Washington, DC, 53 million in Atlanta, 57.6 million in Chicago, and 65.2 million in New York City).[67]

174.    On information and belief, Nevada's economy relies heavily on tourism.  The top 15 employers in Clark County in 2023 were all either departments run by city officials or casinos/resorts (with the exception of Nellis Air Force Base).[68]

175.    Nevada has had significant problems with government corruption, ranking 46 out of 50 states and receiving an "F" grade on the Center for Public Integrity's State Integrity Investigation in 2015.[69]

176.    Over the last several years, federal corruption probes have investigated Nevada's then-governor,[70] and the Las Vegas Metropolitan Police Department – specifically for collaborating with the pimps/sex traffickers they were supposedly investigating.[71]

---

[66] *Nevada Population,* POPULATIONU, www.populationu/us/nevada-population (last visited Feb. 6, 2024).

[67] *America's 30 Most Popular Cities for Tourists 2019,* BEST CHOICE REVIEWS, https://www.bestchoicereviews.org/travel/popular-tourist-cities-us/ (last visited Feb 6, 2024).

[68] *See Comprehensive Area Financial Report,* NEV. LAB. MKT. INFO., https://nevadaworkforce.com/_docs/Top-Employers/20231/Clark-County (last visited Feb 5, 2024). With the exception of the Nellis, the University of Nevada, and the Tesla factory, the top 20 employers for the whole state are exclusively state and local government entities, and casinos/resorts. https://nevadaworkforce.com/_docs/Top-Employers/20231/State-of-Nevada (last visited Feb. 5, 2024).

[69] *See* Felicia Mello, *Nevada Gets F Grade in 2015 State Integrity Investigation,* CENTER FOR PUBLIC INTEGRITY (Nov. 12, 2015, 12:01 PM), https://publicintegrity.org/politics/state-politics/state-integrity-investigation/nevada-gets-f-grade-in-2015-state-integrity-investigation/.

[70] *See* The Associated Press, *Attorney: Nevada Governor Cleared in FBI Probe,* NBC NEWS (Nov. 2, 2008, 5:25 PM), https://www.nbcnews.com/id/wbna27507509.

[71] *See* George Knapp and Matt Adams, *I-Team: Former cop, suspected pimp linked together in FBI investigation,* 8 NEWS NOW (Nov. 11, 2016, 12:40pm), https://www.8newsnow.com/news/i-team-former-cop-suspected-pimp-linked-together-in-fbi-investigation/607916728/; George Knapp and Matt Adams, *I-Team: Explosive Testimony in Police Corruption Case,* 8 NEWS NOW (Nov. 17, 2018, 8:08 AM), https://www.8newsnow.com/news/i-team-explosive-testimony-in-police-corruption-case/859451936/; Dana Gentry, *Cops, pimps winners in FBI Probe,* NEVADA CURRENT (Oct. 31, 2019), https://www.nevadacurrent.com/2019/10/31/cops-pimps-winners-in-fbi-

177.   In 2022, a Nye County Commissioner and a Nye County Sheriff's Deputy were charged with or arrested for, respectively, domestic violence.

178.   In 2023, a Clark County prosecutor was fired after he was arrested in a law enforcement sting for attempting to buy sexual access to a person he believed was a minor. He is currently facing federal charges.

179.   Under state law, the district attorney and sheriff in each county have a statutory obligation to "strictly" enforce the laws against prostitution and sex trafficking, and if they "neglect to do so," they are guilty of a misdemeanor. NEV. REV. STAT. § 201.410.

180.   The Nevada Attorney General has "concurrent jurisdiction" alongside county district attorneys to prosecute prostitution and sex trafficking violations. NEV. REV. STAT. § 201.345.

181.   Chicken Ranch was sued for sex trafficking in 2021, and a federal judge ruled that the plaintiffs had stated a claim against Chicken Ranch for engaging in sex trafficking. *Williams v. Sisolak, 2:21-cv-01676-APG-VCF, Order on Mot to Dismiss, Strike, and Intervene, at * 14 (U.S. D. Nev July18, 2023.* Yet, on information and belief, that complaint has not caused either the State Defendants or Defendant Nye County to investigate or prosecute Chicken Ranch.

182.   Nye County, in an appellate filing, made it clear that it sees no problem with brothel debt bondage practices, characterizing the brothel's locking women inside and employing debt coercion as merely the terms of the brothel contracts (despite the district court finding that Plaintiffs stated a claim against the brothel for sex trafficking on precisely those bases), and  clarifying that it will not prosecute women for escaping from the brothel or force

---

probe/.

them to return, because the brothel can only come after its escapees and debtors in civil, not criminal court. See Nye County Appellee Brief at 43.

183.    On information and belief, there is no state-reported data on sex trafficking investigations, prosecutions, or convictions under state law.

184.    On information and belief, Nevada does not aggressively prosecute sex trafficking.

185.    Yet Nevada's sex trade is disproportionately large; sex trafficking reports in Nevada are out of proportion with the state's small population size.

186.    Nevada's legal brothels generate an estimated 75 million dollars per year, a figure dwarfed by the 5 billion dollars a year Nevada's illegal sex trade generates.[72]

187.    The state government receives revenues from prostitution occurring through escort agencies, as it taxes escort agencies and strip clubs 9% of their fees under the state live entertainment tax. NEV. REV. STAT. § 368A.010–368A.370.

188.    Local governments with legal brothels receive revenues from brothel taxes and fees.

189.    Nevada does not enforce its limited regulation of prostitution, permitting de facto prostitution to exist through escort bureaus, entertainment by referral service, and strip clubs, failing to implement or enforce laws limiting prostitution advertising, and failing to prevent the resultant debt bondage in legal brothels.

190.    Nevada allows not only prostitution within legal and rural brothels, but also escorting and "outcall entertainment" – effectively legalizing prostitution throughout the state – directly for small towns and counties, and through euphemism and inaction in the rest,

---

[72] Flowers, *supra* note 46.

1 without meaningful prevention or accountability for the severe forms of sex trafficking
2 occurring in the Nevada sex trade.

3 ***Plaintiff's exploitation in legalized prostitution***

4 *General allegations*

5     191.    Jane Doe was trafficked in legal Nevada brothel prostitution between 2017
6 and 2023.

7     192.    The counties regulating the legal brothels never screened Jane Doe for sex
8 trafficking.

9     193.    Local law enforcement did not conduct brothel inspections, except to check
10 that the women had been subjected to STI testing and had brothel license cards. They did not
11 screen for sex trafficking or working conditions.

12     194.    Jane Doe was not allowed to keep her own brothel license card.

13     195.    The brothels commonly docked Jane Doe and other women's pay for various
14 infractions (even for things as minor as using too many towels), and also overcharged them
15 when they needed sanitary items and other necessities the brothels would not allow them to
16 leave to purchase.

17     196.    The brothels would search Jane Doe and other women's rooms whenever they
18 wished.

19     197.    Roughly half of the women at the brothels had external pimp/traffickers.

20     198.    Jane Doe saw weapons in all the brothels operated by Brothel Defendants.

21     199.    If the brothels liked a prostituted woman, they would kick a violent customer
22 out, but did not call the police or give her time for counseling. If the customer paid a lot of
23 money, the brothels did not care about stopping his violence at all.

24

*Chicken Ranch (2021)*

200.   The Chicken Ranch brothel is located in Nye County.

201.   Jane Doe engaged in prostitution at Chicken Ranch.

202.   Chicken Ranch took 50% of the fees that Jane Doe and the other women got from the sex buyers.

203.   Chicken Ranch charged women $45 a day for room and board, which totaled $1350 each month.

204.   Chicken Ranch required women to pay for food even if they were unable to eat it for health reasons.  Women sometimes got sick from undercooked meat.

205.   Jane Doe was once hospitalized from consuming spoiled food that Chicken Ranch served.

206.   Chicken Ranch forced the women to subsidize the transportation for the men buying them, charging Jane Doe and the other women a percentage of the fee.

207.   After their initial arrival, Chicken Ranch also charged Jane Doe and the other women for their own transport, $50 each time they used the brothel's transportation.

208.   Chicken Ranch forced women, including Jane Doe, to pay $120 per week for mandatory STI testing.  Eventually, this became $225 per month.

209.   While at Chicken Ranch, Jane Doe had to pay a $150 fee to renew her license every 3 months.

210.   Jane Doe and the other women at Chicken Ranch were not allowed to have cash with them or in their rooms at any time.  Those who violated the cash rule risked forfeiting all the money in their account at a given time.

211.   When someone sent Jane Doe jewelry, Chicken Ranch forced her to have it appraised and pay them half of its value.

212.   If women, including Jane Doe, refused to have a gift appraised, Chicken Ranch would take the whole gift.

213.   Chicken Ranch maintained a barbed wire fence around its property.

214.   Only Chicken Ranch managers were allowed to operate the brothel's front gate entry and exit.

215.   Chicken Ranch did not allow women, including Jane Doe, to leave at all on most days.  Jane Doe was permitted to leave on Tuesdays from 8am to 1pm, but was not permitted to go home, could only go to certain locations outside the brothel, and had to tell Chicken Ranch where she was going.

216.   If Jane Doe or other women ran out of supplies before a Tuesday, they were still not allowed to leave.

217.   Chicken Ranch, at one point, even took women's car keys.

218.   Jane Doe and other women even had to get permission to go outside in the backyard, which was within the locked gates.

219.   Jane Doe was permitted to have a car at Chicken Ranch, but she had to get permission from Chicken Ranch to even go to it.

220.   Chicken Ranch charged women a $500 fee if they left before their two weeks were up.

221.   Chicken Ranch subjected women to searches when they first arrived, and whenever they left for a day or longer.

222.   Chicken Ranch would also search Jane Doe and other women's phones and email accounts whenever they wanted.

223.   Chicken Ranch took away Jane Doe's medicine and mail.  She was sometimes denied her anxiety medication altogether, and forced to open her own mail in front of Chicken

1  Ranch staff.

2  224.  Chicken Ranch would take away women's clothes as well, not permitting them
3  to wear jeans or other pants, nor tennis shoes or flats – Jane Doe and the other women were
4  required to wear heels even if they were injured.

5  225.  Women at Chicken Ranch could be called for a lineup any time of the day or
6  night, seven days a week.

7  226.  Chicken Ranch had 24-hour shifts.  Jane Doe and other women had 3 minutes to
8  respond to a lineup, and if they missed it, they would be fined $500 per occurrence.

9  227.  Chicken Ranch created email accounts for Jane Doe and the other women, which
10  Chicken Ranch monitored.

11  228.  Chicken Ranch Kept Jane Doe and the other prostituted women's Sheriff's
12  cards/licenses under lock and key; the women were not permitted to hold them.

13  229.  Eventually, Chicken Ranch refused to allow the women to keep their own
14  contracts.

15  230.  Although Chicken Ranch had panic buttons, Jane Doe and the other women were
16  discouraged from using them unless there was no other way for them to leave the room.

17  231.  Jane Doe and other women dealt with violent sex buyers who cursed at and
18  threatened them, but Chicken Ranch never called security or the police.

19  232.  Jane Doe was not allowed to leave Chicken Ranch when she quit until she paid
20  the brothel a sum of money.

21  233.  Kenneth Green, the Chicken Ranch brothel owner, had a partner in owning the
22  brothel who was also a silent partner in various Las Vegas strip club/prostitution enterprises,
23  including Hustlers, Déjà Vu Emporium, Showgirls, and Little Darlings.

24

*Desert Rose (2017-2019; 2021-2022)*

234.   The Desert Rose brothel is located in Elko County.

235.   Jane Doe engaged in prostitution at Desert Rose.

236.   Desert Rose took 50% of the fees that Jane Doe and the other women got from the sex buyers.

237.   Desert Rose did not offer food, and charged Jane Doe the other women $50 a week for cleaning fees, even though the women themselves had to do the cleaning.

238.   Desert Rose required Jane Doe and the other women to "work" from 4pm to 4am each day, amounting to 72 hours per week.  Women who were at Desert Rose long term were allowed a weekly day off.

239.   Desert Rose sent Jane Doe and the other women into local bars and town events to find sex buyers, coaching them on how to avoid explicitly discussing prostitution before they were back at the brothel.

240.   Jane Doe at Desert Rose had 3 minutes to respond to a lineup call.  Desert Rose eventually instituted a $100 fine for missing or being late to a lineup.

241.   Desert Rose imposed a very specific dress code on Jane Doe and the other women prostituted there, including requiring them to wear high heels.

242.   Desert Rose charged Jane Doe and the other women $90 a week for STI testing, and $110 for the tests that were required monthly.

243.   Desert Rose maintained a barbed wire fence around the brothel.

244.   The pimp/trafficker who ran Desert Rose, Gabe Ornelas was very violent, and would brandish his gun and even shoot at people.

245.   Elko County did not suspend or revoke his license after he nearly shot one of the prostituted women in the foot in 2022, simply warning him not to do it again.

246.   Gabe Ornelas bragged about paying money under the table to Elko officials to protect his brothel.

247.   The local law enforcement visited the brothel weekly, but did not talk to the women or assess whether they were being forced, coerced, or defrauded.

248.   Desert Rose permitted members of organized crime in the brothel.

249.   In 2021, Desert Rose required Jane Doe to sign a non-disclosure agreement and agree to not say negative things about them.

250.   Jane Doe owed Desert Rose money as a result of these practices.

251.   Most women at Desert Rose went into debt after being there.

252.   Desert Rose bullied Jane Doe when she wanted to go to the police and threatened her with their lawyer.

253.   Jane Doe was also threatened by Ornelas, was contacted by people with gang affiliations, and received indications that people were watching her.

*Bella's (2020)*

254.   Bella's brothel is located in Elko County.

255.   Jane Doe engaged in prostitution at Bella's.

256.   Bella's did not require Jane Doe to have any kind of a license, partly because Bella's was staying open during the COVID pandemic.

257.   Bella's took 50% of the fees that Jane Doe and the other women got from the sex buyers.

258.   Jane Doe paid Bella's $40-50 per week for room and board.

259.   Bella's required additional payments from Jane Doe to cook food onsite or use the brothel's silverware.

260.   Bella's had a fence and gate, and did not allow Jane Doe to leave at will.

261.   Jane Doe's requests to leave Bella's were at times denied.

262.   Bella's tracked Jane Doe's movements even while on the brothel premises. Jane Doe was always required to let the brothel know where she was when she was at the brothel.

263.   Bella's fined Jane Doe for opening a window.

264.   Bella's did not give Jane Doe her final paycheck, which was around $1000, as punishment for leaving.

265.   Bella's was never even inspected by a Sheriff while Jane Doe was there.

266.   Jane Doe attempted to challenge Bella's for withholding her final check, and Bella's threatened to report Jane Doe for prostitution without a valid license.

*Mustang Ranch (2019-2020)*

267.   The Mustang Ranch brothel is located in Storey County.

268.   Jane Doe engaged in prostitution at Mustang Ranch.

269.   In the initial brothel intake interview, Mustang Ranch forced Jane Doe and the other women to sign a nondisclosure agreement and also a legal agreement stating that they were not being trafficked. The Mustang Ranch employees handling the brothel intake process would laugh about trafficking.

270.   Lance Gilman would brag in the brothel about how he had all of Reno under his thumb.

271.   Mustang Ranch had an apparent agreement with the Storey County Sheriff. For other brothels, law enforcement would usually ask for a woman's ID before giving her the brothel card, but at the Storey County Sheriff's office, they just wanted the piece of paper with Mustang Ranch's name on it saying that the woman was employed by Mustang Ranch for prostitution.

272. Jane Doe and the women with her were in and out of the Sheriff's office in about 5 minutes, having been handed licenses without questions or any kind of checks. When Jane Doe questioned the process, Mustang Ranch's driver told her to stop talking.

273. While at Mustang Ranch, Jane Doe was not allowed to keep personal belongings in her room.

274. When Mustang Ranch realized Jane Doe was keeping track of their actions, they took away part of her contract copy.

275. Mustang Ranch took 50% of the fees that Jane Doe and the other women got from the sex buyers.

276. Mustang Ranch charged women $40-50 per day for room and board.

277. Mustang Ranch charged women, including Jane Doe, for laundry.

278. Mustang Ranch charged women, including Jane Doe, limousine fees for their driver – forcing the women to pay 30% of the driver's flat rate for transporting the men buying them to the brothel.

279. At Mustang Ranch, Jane Doe and other women had 3 minutes to respond to a lineup, and if they missed it, they would be fined $1500 per occurrence.

280. Jane Doe and other women slept in their heels and makeup as a result of the lineup policy.

281. Mustang Ranch required Jane Doe and the other women to work 12-hour (and sometimes even longer) shifts, but forced them to get up earlier.

282. Mustang Ranch required Jane Doe and the other women to ask permission to take a nap or go to the bathroom.

283. Mustang Ranch forced Jane Doe to open her medicine and mail in front of them.

284.   Mustang Ranch had locked gates and Jane Doe and other women had no ability to open them.

285.   Mustang Ranch sometimes took women's car keys.

286.   Mustang Ranch instituted a "buddy system" and did not allow Jane Doe or other women to leave by themselves.

287.   Mustang Ranch required Jane Doe and other women to obtain permission to go outside in the yard within the locked gates.

288.   Defendant Mustang Ranch sometimes changed the gate codes to further prevent Jane Doe and the other women at the brothel from leaving the premises.

289.   Mustang Ranch would make Jane Doe and other women turn over their phones for searches, and also search their email accounts whenever they wanted.

290.   If a woman felt she was in danger and pushed the panic button, the Sheriff never came.

291.   Women sometimes got in trouble for pressing the panic button if Mustang Ranch did not think there was enough of an emergency.

292.   Mustang Ranch charged Jane Doe and the other women $150-$200 a week for mandatory STI testing.  If Jane Doe left the brothel, even for just a day, without the brothel's driver, she was subjected to new tests.

293.   Mustang Ranch's doctor was degrading toward the women and refused to do anything other than the testing – she did not prescribe antibiotics, nor any kind of medicine for treating STIs.

294.   Mustang Ranch pressured Jane Doe and the other women to have sex with longtime sex buyers without condoms, in violation of state regulations.

295.   Mustang Ranch treated Black and Latina women more harshly than the other

1 | women.

2 | 296.   Jane Doe, who is Black, once received a $2000 fine for an infraction while a
3 | white woman was not punished at all for the same thing.

4 | 297.   Mustang Ranch made social media pages for Jane Doe and the other women,
5 | which Mustang Ranch controlled.

6 | 298.   Mustang Ranch would sell video clips of women on its website, sometimes
7 | after those women had been fired and were no longer at the brothel.

8 | 299.   At Mustang Ranch, Lance Gilman would hold classes that Jane Doe attended –
9 | complete with workbooks – on how to break Nevada's prostitution advertising laws.

10 | 300.   Mustang Ranch also disregarded other prostitution laws, sending women to
11 | Reno and Las Vegas on "out-dates" with sex buyers.  One woman was drugged and raped
12 | during an "out-date," and Mustang Ranch did nothing to help her.

13 | 301.   Mustang Ranch prostituted women during the COVID pandemic, including
14 | when brothels were supposed to be closed.

15 | 302.   Mustang Ranch's live-in attorney threatened to sue Jane Doe if she did not stop
16 | speaking about their exploitative practices.

17 | 303.   Mustang Ranch would kick women out in the snow and rain, which made
18 | women afraid to be kicked out despite the constraints on their movement.

19 | 304.   When Mustang Ranch kicked women out, they would often have to leave on
20 | foot or use the last of their money for transportation.

21 | 305.   Mustang Ranch verbally assaulted and then kicked Jane Doe out in the snow
22 | around Christmastime in 2019, for being late returning from vacation, even though Jane Doe's
23 | flight was delayed due to the snow.

24 | 306.   Because of Jane Doe's flight delay, she did not arrive in time for Mustang

1 | Ranch's doctor to subject her to an STI examination.

2 |   307. Another woman stood up for Jane Doe, so Jane Doe was instead put in a part of
3 | the brothel that had no running water for the bathtub or working lights, instead of being left in
4 | the snow. There was no heat in that room that night either, though the brothel turned the heat
5 | on the next morning.

6 |   308. At a later point, because Jane Doe attempted to console and help another woman
7 | at the brothel, Mustang Ranch woke her up from her sleep, forced her to take only what she
8 | could fit into two small bags, and had her escorted out by guards and embarrassed.

9 |   309. Mustang Ranch kicked Jane Doe out in her pajamas, and she used the last of
10 | her money to call an uber and go to a hotel.

11 |   310. When the hotel realized her situation, they said that they witness this all the
12 | time and would not charge her for that night.

13 |   311. Mustang Ranch kept Jane Doe's final check, and never paid her.

14 |   312. Mustang Ranch took Jane Doe's clothing, work items, documents, and laptop.
15 | They would not let her return to retrieve anything, nor would they even return her messages
16 | requesting to get her property.

17 |   313. As a person recently sex trafficked within Nevada, Plaintiff Jane Doe is an
18 | appropriate person to assert third-party standing on behalf of people currently being sex
19 | trafficked within legal brothels in Nevada, particularly people Jane Doe still knows of who are
20 | being trafficked in the brothels she was also in.

21 |   314. Persons currently being sex trafficked within Nevada, being in a condition of
22 | slavery or involuntary servitude, are thereby unable to enforce their rights and seek redress
23 | apart from the third party standing which Plaintiff asserts.

24 |

**COUNT I**
**VIOLATING THE THIRTEENTH AMENDMENT BAN ON SLAVERY**

315.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.  Plaintiff asserts third party standing on behalf of people currently being sex trafficked within legal brothels in Nevada jurisdictions which permit prostitution, as to the rights violations described below.

316.    The Thirteenth Amendment to the United States Constitution guarantees Plaintiff the freedom from enslavement and involuntary servitude, which prohibits Defendants both from directly subjecting Plaintiff to slavery or involuntary servitude, and from providing legal cover to, or otherwise enabling, any system of slavery or involuntary servitude.

317.    Brothel Defendants directly subjected Plaintiff to slavery and involuntary servitude in the form of sex trafficking.

318.    State and County Defendants provided legal cover for the Nevada sex trade, particularly by licensing Brothel Defendants and requiring Plaintiff and other prostituted persons to remain under their control – thus facilitating and enabling the system through which the Plaintiff was subjected to slavery and involuntary servitude in the form of sex trafficking.

319.    Defendants' conduct has caused Plaintiff serious harm, including physical, psychological, financial, and reputational harm.

320.    Under 42 U.S.C. § 1983, Plaintiff is entitled to a declaration that State and County Defendants violated her Thirteenth Amendment rights to be free from slavery and involuntary servitude, and an injunction against State and County Defendants' laws, policies, and actions.

321.    Additionally, Plaintiff is entitled to nominal damages from the State Defendants, and damages in an amount to be determined by the evidence and this Court from

1 the County and Brothel Defendants.

2 ## COUNT II
## VIOLATING 18 U.S.C. §§ 1591(A)(1) AND 1595 BY PERPETRATING SEX
3 ## TRAFFICKING

4 322.    Plaintiff realleges and incorporates by reference all prior paragraphs as if fully

5 incorporated here.

6 323.    Plaintiff asserts third party standing on behalf of people currently being sex

7 trafficked within legal brothels in Nevada, as to the rights violations described below.

8 324.    County Defendants knowingly harbored and/or maintained Plaintiff, knowing

9 or in reckless disregard of the fact that force, fraud, and/or coercion were being used to induce

10 Plaintiff to engage in commercial sex acts.

11 325.    Brothel Defendants knowingly recruited, enticed, harbored, transported,

12 provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff, knowing or

13 in reckless disregard of the fact that force, fraud, and/or coercion were being used to induce

14 Plaintiff to engage in commercial sex acts.

15 326.    Defendants knew that their conduct was in or affected interstate and/or foreign

16 commerce.

17 327.    Defendants' conduct has caused Plaintiff serious harm, including physical,

18 psychological, financial, and reputational harm.

19 328.    Accordingly, Defendants violated 18 U.S.C. § 1591(a)(1), and Plaintiff is

20 entitled to sue them under § 1595(a).

21 ## COUNT III
## VIOLATING 18 U.S.C. §§ 1591(A)(2) AND 1595 BY BENEFITING FROM SEX
22 ## TRAFFICKING

23 329.    Plaintiff realleges and incorporates by reference all prior paragraphs as if fully

24 incorporated here.

330.    Plaintiff asserts third party standing on behalf of people currently being sex trafficked within legal brothels in Nevada jurisdictions which permit prostitution, as to the rights violations described below.

331.    Through local taxes, licensing fees, and the general tourism revenue derived from their reputations as legal havens for commercial sex, County Defendants knowingly benefit, financially and by receiving something of value, knowing or in reckless disregard of the fact that they are participating in sex trafficking ventures.

332.    Through local taxes, licensing fees, and the general tourism revenue derived from their reputations as legal havens for commercial sex, County Defendants knowingly benefit, financially and by receiving something of value, from what they know or should know are sex trafficking ventures.

333.    Through revenues for commercial sex, Brothel Defendants knowingly benefit, financially and by receiving something of value, knowing or in reckless disregard of the fact that they are participating in sex trafficking ventures.

334.    Through revenues for commercial sex, Brothel Defendants knowingly benefit, financially and by receiving something of value, from what they know or should know are sex trafficking ventures.

335.    Defendants knew that their conduct was in or affected interstate and/or foreign commerce.

336.    Defendants' conduct has caused Plaintiff serious harm, including physical, psychological, financial, and reputational harm.

337.    Accordingly, Defendants have violated 18 U.S.C. §§ 1591(a)(2) and 1595(a) and Plaintiff is entitled to sue them under § 1595(a).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully request that this Court enter judgment against Defendants and provide Plaintiff and people currently being sex trafficked within legal brothels in Nevada jurisdictions which permit prostitution:

A. A declaratory judgment as currently implemented and enforced by state and local practices and policies, the following statutes are unconstitutional: NEV. REV. STAT. § 244.345 (as to permitting prostitution in certain counties, escorting, and entertainment by referral service); NEV. REV. STAT. § 244.335(2) (as to permitting prostitution in certain counties, escorting, and entertainment by referral service); NEV. ADMIN. CODE § 441A.777-815 (mandating one-sided forcible testing of prostituted persons); and the brothel licensing ordinances of Elko, Lander, Lyon, Mineral, Nye, Storey, and White Pine Counties, to the extent that they permit prostitution: ELKO, NEV., COUNTY CODE, "Sexually Oriented Businesses and Employee Licensing Chapter," § 6-11 (2020); LANDER, NEV., COUNTY CODE, "Prostitution," § 5.16 (2020); LYON, NEV., COUNTY CODE, "Lyon County Brothel Ordinance," § 5.03 (2020); MINERAL, NEV., COUNTY CODE, "Prostitution," § 5.12 (2019); NYE, NEV., COUNTY CODE, "Prostitution," § 9.20 (2020); STOREY, NEV., COUNTY CODE, "Brothels," § 5.16 (2015); and WHITE PINE, NEV., COUNTY CODE, "Prostitution," § 10.36 (2021).

B. An injunction preventing all Defendants from implementing or enforcing: NEV. REV. STAT. § 244.345 (as to permitting prostitution in certain counties, escorting, and entertainment by referral service); NEV. REV. STAT. § 244.335(2) (as to permitting prostitution in certain counties, escorting, and entertainment by referral service); NEV. ADMIN. CODE § 441A.777-815 (mandating one-sided forcible testing of prostituted persons); and the brothel licensing ordinances of Elko, Lander, Lyon, Mineral, Nye,

Storey, and White Pine counties, to the extent that they permit prostitution; and from any form of perpetrating or financially benefiting from violations of federal anti-trafficking laws.

   C. Nominal damages against the State Defendants;

   D. Compensatory, consequential, general, and punitive damages against the County and Brothel Defendants in an amount to be determined at trial;

   E. Restitution and disgorgement of all profits and unjust enrichment obtained as a result of Defendants' unlawful conduct;

   F. Plaintiff' reasonable attorneys' fees, costs, and other costs and disbursements in this action under 42 U.S.C. § 1988; and

   G. All other further relief to which Plaintiff may be entitled.

DATED this 8th day of February 2024.

Jason D. Guinasso (SBN# 8478)

Benjamin W. Bull*
Peter A. Gentala*
Dani Bianculli Pinter*
Christen M. Price*
Victoria Hirsch*
NATIONAL CENTER ON SEXUAL
EXPLOITATION

*Pro Hac Vice applications forthcoming
Attorneys for Plaintiff